**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. _____

RANDI FREYER,
BRANDY BECK,
ERIN ZIELINSKI, and
SHANNON KIEDROWSKI,

                                    Plaintiffs,
        v.

FRONTIER AIRLINES, INC.,

                                    Defendant.

_____

## COMPLAINT AND JURY TRIAL DEMAND

_____


        Plaintiffs Randi Freyer, Brandy Beck, Erin Zielinski, and Shannon Kiedrowski, by and

through their attorneys Sara Neel and Mark Silverstein of the AMERICAN CIVIL LIBERTIES UNION

FOUNDATION OF COLORADO, Galen Sherwin of the WOMEN'S RIGHTS PROJECT OF THE AMERICAN

CIVIL LIBERTIES UNION FOUNDATION, and Vincent Levy, Jayme Jonat, and Lani Perlman of

HOLWELL SHUSTER & GOLDBERG LLP, respectfully allege for their Complaint and Jury Demand

as follows:

## <u>INTRODUCTION</u>

        1.      Plaintiffs in this case are female pilots at Frontier Airlines, with several decades

of flying experience between them, who had children and breastfed their babies during their

employment with Frontier. They chose their careers as pilots because of their passionate love of

flying—for most, it was the only career they'd ever considered. Like most expectant parents,

when it came time to start their families, they were overjoyed to start this exciting new chapter of their lives. At the same time, they were dedicated to the careers they loved and assumed they would be able to continue working while raising their children—after all, the right to keep your job during pregnancy and after having a baby has been the law for more than 40 years, since the enactment of the Pregnancy Discrimination Act ("PDA"). Yet Plaintiffs found themselves faced with mounting obstacles once they became pregnant that forced them to make impossible choices between their families and their livelihood—precisely the type of choices that the PDA was intended to prevent.

2.       Frontier's failure to account for Plaintiffs' needs related to pregnancy and breastfeeding caused them to suffer serious penalties, both at and outside of work, simply because they had children. Frontier forced them onto unpaid leave at a certain point during their pregnancies, with no possibility of receiving any accommodations that would have enabled them to continue working, depriving them of critical income when they needed it the most. As Frontier offered no paid parental leave and only a short unpaid leave following childbirth, Plaintiffs were all still breastfeeding their newborns when it came time for them to return to work. Yet Frontier refused to make it possible for them to pump breast milk on the job, which they needed to do to be able to continue nursing. This left Plaintiffs with the Hobson's choice of continuing to breastfeed or continuing to earn a paycheck. Plaintiffs paid a steep price as a result of these policies and practices, including being forced onto unpaid leave, forced to give up breastfeeding and the many associated benefits for their own and their babies' health, and forced to work under conditions that have caused them physical pain and emotional distress and have put their health at risk.

3.      For example, Plaintiff Kiedrowski was subjected to disciplinary action for seeking accommodations related to pumping and was prohibited from pumping while in uniform. When Plaintiff Zielinski requested breastfeeding accommodations, she was accused of "baiting" the company and was locked out of her company email account; upon her return to work, she suffered from mastitis. After her second child was born, Ms. Zielinski had no choice but to go on unpaid leave for the duration of the period she was breastfeeding. Plaintiffs Beck and Freyer also had their accommodations requests go ignored or unanswered, and they were ultimately forced to pump in an unsanitary airplane lavatory between flights. Frontier ignored Plaintiff Freyer's requests for a ground assignment during her pregnancy and when she was preparing to return to work, and then when she did return, prohibited her from pumping while the plane was in flight, while simultaneously ignoring her requests for assistance in adjusting her schedule or securing adequate facilities to pump during ground time. As a result of the lack of adequate breaks and sanitary facilities in which to pump, she regularly suffered from pain, engorgement, the humiliation of leaking breasts, and on two occasions, mastitis.

4.      Frontier's policies and practices challenged here are a legacy of the long and unfortunate history of sex discrimination in the airline industry as a whole. Most airlines at one time had explicit policies forcing female flight attendants off the job when they got married or became pregnant, subjecting them to discriminatory requirements related to their weight and appearance, and imposing blatant gender stereotypes. Female pilots were almost unheard of due to blatant discrimination in hiring, as well as ostensibly "neutral" policies such as height requirements that effectively froze them out of well-paying pilot jobs. Although many of these more overt practices have been abandoned in the face of lawsuits and changing social norms,

more subtle forms of discrimination persist, many of which have the same effect of forcing women off the job, especially when they become pregnant or have children.

5.      Frontier's policies and practices have had precisely that effect. Frontier has systematically discriminated against pregnant and breastfeeding pilots by singling out pregnancy and breastfeeding for disadvantaged treatment and by failing to comply with Colorado laws that require employers to accommodate pregnancy and related medical conditions and specifically mandate the provision of break time and a private, sanitary location to pump. Plaintiffs seek commonsense policy changes that would enable pregnant and breastfeeding pilots to continue working and eliminate the many disadvantages they suffer, as well as a declaration that Frontier's policies and practices were unlawful.

6.      The principal policies and practices challenged in this case include:

a.      ***The Post-32 Week Pregnancy Ban:*** Frontier forced all pregnant pilots onto unpaid leave at 32 weeks of pregnancy, regardless of their medical fitness or certification to fly. Pregnancy is the only medical condition Frontier singled out for such an automatic disqualification from flying. This is contrary to FAA rules, which recognize that medical certification to continue flying during pregnancy should be determined case by case, depending on the pilot's individual medical circumstances.

b.      ***Forced Unpaid Leave and Refusal to Accommodate Pregnancy:*** Grounded at least two months before they were due to have their babies, Plaintiffs were forced to go on unpaid leave. Yet Frontier provided no options for Plaintiffs that would have enabled them to continue working during the period when they were grounded. Frontier has ignored or outright denied requests from Plaintiffs for accommodations such as temporary job reassignment, while providing pilots with similar restrictions for reasons

4

other than pregnancy the option to seek a temporary alternative assignment in a ground position.

       **c.**       ***Refusal to Accommodate Breastfeeding and Ban on Pumping on Duty:***

Frontier offered no paid time off for childbirth, and Plaintiffs were expected to return to work four months after giving birth. Although many pilots, including Plaintiffs, were still breastfeeding when they returned to work, Frontier had no policy to address pilots' need for accommodations related to breastfeeding. Frontier provided neither breaks to express breast milk nor accessible, sanitary facilities to use for pumping when they were working. And Frontier has systematically refused to respond to Plaintiffs' requests for accommodations related to breastfeeding or to provide any such accommodations. Instead, Frontier has ignored or categorically denied all requested accommodations that would allow pilots who were breastfeeding to remain on the job. Frontier has even gone so far as to prohibit pilots from pumping on the job, even though pilots are permitted to take breaks as needed to address other physiological needs such as going to the bathroom or stretching—essentially singling out the need to express breast milk as the sole physiological need that pilots are categorically banned from addressing while in flight.

       7.      Frontier's treatment of pilots who are pregnant or breastfeeding has violated and continues to violate state and federal law, including: Title VII of the 1964 Civil Rights Act, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII"); the Colorado Law on Reasonable Accommodations for Pregnancy and Related Conditions, Colo. Rev. Stat. Ann. § 24-34-402.3; the Colorado Workplace Accommodations for Nursing Mothers Act ("WANMA"), Colo. Rev. Stat. § 13-1-124(1); and the Colorado Anti-discrimination Act ("CADA"), Colo. Rev. Stat. § 24-34-401 *et seq.* They seek declaratory and injunctive relief as well as all available legal and equitable

remedies to redress the effects of Frontier's systemic, pervasive and discriminatory employment policies and practices.

## JURISDICTION AND VENUE

8.      This Court has original federal question jurisdiction under 28 U.S.C. § 1331 because this case is brought under Title VII of the 1964 Civil Rights Act, 42 U.S.C. §§ 2000e, *et seq.*, as well as other state laws. This Court also has jurisdiction pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201.

9.      Personal jurisdiction over Frontier Airlines is proper because Frontier does business in the state of Colorado, including operating its principle place of business in Denver County, Colorado, and a principle airline hub at Denver International Airport, and because some of the events giving rise to the action occurred in Denver, Colorado.

10.      Venue is proper under 28 U.S.C. § 1391(b) because the actions alleged to be unlawful were committed in and around Denver, Colorado, where all of the Plaintiffs work, and because all but one of the Plaintiffs reside within this judicial district.

11.      This Court has pendent jurisdiction over Plaintiffs' Colorado state law claims brought under the Colorado Law on Reasonable Accommodations for Pregnancy and Related Conditions, CADA, and WANMA, as those claims arise from the same nucleus of operative facts as Plaintiffs' federal statutory claims.

12.      Each of the Plaintiffs has exhausted her administrative remedies by filing a timely charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC") alleging violations of Title VII, the Colorado Law on Reasonable Accommodations for Pregnancy and Related Conditions, and CADA.

13.     Pursuant to worksharing agreements that were in effect at all relevant times, Plaintiffs' Colorado state law charges were jointly filed with the Colorado Division of Civil Rights. Plaintiffs Beck, Freyer, Zielinski and Kiedrowski filed their charges on May 9, 2016. Plaintiffs requested a Notice of Right to Sue from the EEOC on December 2, 2019.

14.     Plaintiffs have offered on numerous occasions to engage in mediation, beginning on May 26, 2017. Frontier declined to respond at that time.

15.     Most recently, on August 16, 2019, Plaintiffs proposed mediation and agreed to certain terms set by Frontier. Discussions regarding mediation terminated on September 24, 2019, when Frontier declined to mediate on those terms. Plaintiffs are therefore unable to resolve their claims through mediation.

## **PARTIES**

16.     Plaintiff Brandy Beck is and has been at all relevant times a commercial airline pilot employed by Frontier holding the position of First Officer. She was at all times relevant hereto a resident of and domiciled in Denver, Colorado. In the course of her employment with Frontier, the airport she is based out of—i.e. reports to work at—is Denver International Airport.

17.     Plaintiff Randi Freyer is and has been at all relevant times a commercial airline pilot employed by Frontier Airlines holding the position of First Officer. She was at all times relevant hereto a resident of and domiciled in Eagle, Colorado. In the course of her employment with Frontier, Ms. Freyer is based out of Denver International Airport.

18.     Plaintiff Erin Zielinski is and has been at all relevant times a commercial airline pilot employed by Frontier Airlines holding the position of First Officer. She was at all times relevant hereto a resident of and domiciled in Denver, Colorado. In the course of her employment with Frontier, Ms. Zielinski is based out of Denver International Airport.

19.     Plaintiff Shannon Kiedrowski is and has been at all relevant times a commercial airline pilot employed by Frontier Airlines holding the position of First Officer. She was at all times relevant hereto a resident of and domiciled in Golden, Colorado. In the course of her employment with Frontier, Ms. Kiedrowski is based out of Denver International Airport.

20.     Defendant Frontier Airlines is a corporation registered in and with a principle place of business located in Denver, Colorado. At all relevant times Frontier has employed 15 or more employees.

## FACTUAL ALLEGATIONS

## A.     BACKGROUND RELEVANT TO PREGNANCY AND BREASTFEEDING[1]

21.     The typical duration of pregnancy is 40 weeks.

22.     The condition of being pregnant does not, by itself, disqualify a pregnant pilot from flying.

23.     For some individuals, pregnancy may cause physiological changes and conditions such as morning sickness, swelling, fatigue and pelvic pain. Depending on their individual health circumstances, a pregnant pilot's health care provider may also place restrictions on performing specific activities. These conditions or restrictions are likely to limit a pregnant pilot's ability to perform their job duties at a certain point during the pregnancy. The point at which that happens varies from person to person depending on individual medical circumstances along with other factors.

---

[1] For purposes of this Complaint, the term "breastfeeding" includes both feeding a baby breast milk directly from the breast or feeding pumped breast milk from a bottle or other feeding method. The terms "breastfeeding" and "lactation" are also used interchangeably to describe the condition of the human body that results in production and secretion of breast milk.

24.     Lactation is the production and secretion of breast milk by the mammary glands. Lactation arises following and as a direct result of pregnancy and childbirth due to hormones secreted in the body during and after birth.

25.     A broad consensus exists among medical and public health experts that breastfeeding is optimal for infants for a year or longer following birth, and that it has broad developmental, psychological, social, economic and environmental benefits. According the United States Surgeon General, breastfeeding protects babies from illnesses like ear, skin, and respiratory infections, diarrhea, and vomiting, as well as longer-term conditions such as obesity, type 1 and 2 diabetes, and asthma. In addition, those who breastfeed for the recommended duration themselves benefit from lower risks of post-partum depression, breast cancer, heart disease, and other ailments.

26.     All major leading medical associations, including the American Academy of Pediatrics, the American Academy of Family Physicians, the American Public Health Association, the American College of Obstetricians and Gynecologists, the American Academy of Nutrition and Dietetics, and the World Health Organization endorse breastfeeding as optimal because of the demonstrated health benefits both for those who breastfeed and for their infants.

27.     The American Academy of Pediatrics recommends that infants be fed breast milk exclusively for the first six months following birth, and that after six months, they be fed primarily breast milk supplemented by other foods. Breastfeeding is recommended for at least a year "or as long as is mutually desired by mother and infant."

28.     Those who are breastfeeding and are separated from their babies must remove, or "express," breast milk from the breast on roughly the same schedule as the baby's feeding schedule. This is usually accomplished by using a breast pump, which is a manual or electric

device for drawing milk from the breasts by suction, and the process of removing breast milk from the breasts with a pump is referred to as "pumping." Regular pumping ensures that there is a supply of milk on hand for the baby to take from a bottle regardless of whether the breastfeeding parent is physically present and helps to maintain adequate production of breast milk.

29.     While the pumping schedule varies from person to person based on numerous factors, those who are breastfeeding typically need to pump breast milk every two to three hours for the first year of their baby's life.

30.     The process of pumping typically takes between 15 and 25 minutes, depending on the individual.

31.     The process of pumping can, if necessary, be terminated at a moment's notice in roughly the same amount of time it would take to terminate a trip to the restroom for other physiological needs.

32.     Failure to remove milk from the breasts with sufficient frequency causes pain, swelling, discomfort, and leaking breast milk, and can lead to medical complications, including blocked ducts or mastitis, an infection of the breast tissue, as well as diminished milk supply, and ultimately cessation of lactation altogether.

33.     In accordance with the medical consensus in support of breastfeeding, the United States and the State of Colorado have adopted policies that support continuation of breastfeeding upon return to the workforce.

34.     Obstacles to pumping at work are associated with shorter duration of breastfeeding and are a leading reason that many workers terminate breastfeeding despite their desire to continue doing so.

35.     A restroom or lavatory is generally not considered an appropriate place to express breast milk and should be used only as a last resort. Even if a restroom is kept clean, the potential for contamination by harmful bacteria makes it risky to handle either breast pumping equipment or breast milk itself. There are also concerns related to comfort, privacy, and availability that apply to both single-user and multi-user facilities.

*36.*     In accordance with the strong medical consensus on the benefits of breast milk and breastfeeding, and in accordance with their doctor's recommendations, all Plaintiffs wished and intended to breastfeed their babies.

## B.     FRONTIER'S POLICIES AND PRACTICES APPLICABLE TO THE PLAINTIFFS

### Frontier's Post-32 Week Pregnancy Ban

37.     At all relevant times, Frontier required pilots who became pregnant to "request maternity leave" following the 32nd week of pregnancy or after they were no longer certified as medically fit to fly, whichever occurred sooner. The "maternity leave" that commenced at this time was mandatory, and consisted of prohibiting pilots from flying and forcing them onto leave for the duration of the pregnancy.

38.     Pursuant to Federal Aviation Administration ("FAA") regulations, pilots are required to hold a medical certificate indicating their medical fitness to perform their duties.

39.     Aviation Medical Examiners are physicians authorized by the FAA to perform physical examinations on pilots and issue medical certifications that a pilot is medically fit to perform their duties pursuant to FAA regulations.

40.     The Guide for Aviation Medical Examiners is a publication that sets standards to guide Aviation Medical Examiners in determining whether pilots are medically fit to perform their duties pursuant to FAA regulations.

41.     The Guide for Aviation Medical Examiners provides that "Pregnancy under normal circumstances is not disqualifying." It further provides: "It is recommended that the applicant's obstetrician be made aware of all aviation activities so that the obstetrician can properly advise the applicant. The Examiner may wish to counsel applicants concerning piloting aircraft during the third trimester."

42.     Frontier's policy banning pilots from flying following 32 weeks of pregnancy is the only one of its policies that mentions a medical condition by name or subjects it to a categorical ban on flying at a particular point.

43.     All other medical conditions are governed by FAA standards regarding medical certificates of fitness for duty, and upon information and belief, determinations as to medical fitness for duty as to all or virtually all other conditions are left in the discretion of Aviation Medical Examiners and are made on an individualized basis based on objective and accepted medical standards in the aviation industry.

**Forced Unpaid Leave and Refusal to Accommodate Pregnancy**

44.     The so-called "maternity" leave that pilots were forced to take when grounded during their pregnancies was unpaid, except to the extent that the pilot was able to use any accrued paid time off, such as vacation or sick time, during the leave.

45.     Frontier provided no alternatives for pilots when they were grounded that would have enabled them to continue working.

46.     Frontier has refused to engage in an interactive process to identify reasonable accommodations for or to provide accommodations, including temporary job reassignment, to pilots who are grounded during their pregnancies.

47.     At all relevant times, Frontier has maintained a policy governing provision of accommodations to pilots with disabilities, and policies providing for pilots who had been injured on the job or grounded for reasons unrelated to pregnancy to be placed in non-flying positions.

48.     Frontier engages in an interactive process with and has provided reasonable accommodations to pilots with disabilities, injuries, and medical conditions unrelated to pregnancy, childbirth, or lactation, but who are otherwise similar in their ability or inability to work, including modified duty, temporary alternative job assignments in non-flying positions, and other forms of reasonable accommodation that have enabled them to continue working.

**Refusal to Accommodate Breastfeeding**

49.     At all relevant times, Frontier permitted pilots who gave birth to take up to 120 days of unpaid "maternity leave" following birth, concurrent with leave taken under the FMLA. Pilots at Frontier were permitted to use any remaining accrued paid sick and vacation days during this time period; after any such days were exhausted, the remaining leave was unpaid.

50.     After the 120-day leave period following birth, the policy specified that pilots were required to return to work as soon as they were deemed medically fit for duty.

51.     Many pilots were still breastfeeding when their period of leave ended 120 days after they gave birth. This was true for all of Plaintiffs.

52.     Frontier has granted pilots who experience medical complications following childbirth an extension of the unpaid maternity leave period by placing the pilot on an unpaid medical leave of absence.

53.     However, Frontier has engaged in a policy, pattern, or practice of routinely denying pilots' requests to extend the period of leave following childbirth for reasons related to

breastfeeding, on the ground that breastfeeding was not a condition that qualified for medical leave.

54.     Pilots are required to undergo retraining after taking a leave of any kind of more than 90 days. The duration and type of training varies depending on how long the pilot has been on leave, and may consist of "recurrent ground training" (which is classroom instruction), and/or a "check ride" in a flight simulator.

55.     Pilots at Frontier, under most circumstances, are paid based on the number of hours of "pay credit" they accrue in a given month. Pay credit hours are based on the number of "block hours" worked. Block hours are the actual number of hours between the time when the plane is "blocked in"—i.e. the time at which the aircraft is at the gate, the parking brake is set, and a door is opened—and when it is "blocked out"—i.e. the time at which the aircraft's parking brake is released and all doors are closed for departure.

56.     Pilots at Frontier receive a monthly minimum pay guarantee and are required to have a minimum of 70 hours of pay credit per month. They are not permitted to drop below 50 hours at any time and must end the month with at least 70 hours.

57.     Pilots at Frontier can work more than 12 hours a day, with flight times ranging from one hour to five hours. Frequently, pilots take overnight trips of two to five days, and spanning multiple cities.

58.     Pilots' schedules are determined by a bidding system that is based on seniority.

59.     Breastfeeding pilots may require accommodations because the need to express breast milk at periodic intervals as needed, without accommodations, may pose conflicts with training and/or a regular flight schedule, and because they require a private and sanitary location to pump.

60.     At all relevant times, Frontier had no written policies related to pilots who were breastfeeding. Unless a pilot specifically requested accommodations related to breastfeeding, Frontier did not discuss or provide guidance to pilots as to what was or was not permitted with respect to pumping on the job.

61.     At all relevant times, Frontier has not provided break time for the purpose of allowing pilots to express breast milk for their nursing child.

62.     At all relevant times, Frontier has not provided any non-bathroom locations where pilots who are breastfeeding are able to pump breast milk while they are working.

63.     At all relevant times, pumping in the aircraft lavatory was a widespread practice among pilots who were breastfeeding, despite it being unsanitary, hot, and cramped.

64.     Although pilots have breaks of about 45 minutes between flights, their pre- and post-flight duties leave only about 15 minutes of time to attend to personal needs, such as eating meals or using the restroom. Additionally, these breaks are sometimes compressed due to flight delays.

65.     The breaks pilots have between flights are frequently insufficient in length to permit pilots who are breastfeeding to pump.

66.     Frontier has maintained a policy, pattern, or practice of refusing to engage in an interactive process with or to provide reasonable accommodations to pilots who are breastfeeding that would enable them to continue breastfeeding and still return to work without risking their health.

67.     Following the filing of Plaintiffs' EEOC charges, Frontier reversed its position and placed several of the Plaintiffs on unpaid medical leave instead of responding to their other requests for accommodations, although several of them had expressed a preference for

accommodations that would have permitted them to continue working. The extensions of medical leave have been provided inconsistently and at the discretion of Frontier.

68.     Frontier did not assist pilots in identifying any locations for pumping at Denver International Airport, which was Plaintiffs' base airport, or at the other airports to which Frontier flies ("outstations"), until after the Plaintiffs initiated charges before the EEOC. The locations designated on the list Frontier ultimately provided proved in large part to be unusable or inaccessible.

**Frontier's Ban on Use of Breaks for Pumping**

69.     FAA regulations require that pilots remain at the controls while the airplane is taking off or landing and while it is en route, but pilots are permitted to leave the flight deck in connection with "physiological needs."

70.     Per FAA guidance, physiological needs include needs such as using the restroom and stretching one's legs.

71.     FAA regulations place no limit on the permitted duration or frequency of a break taken in connection with physiological needs.

72.     Pursuant to FAA regulations, Frontier permits pilots to take physiological needs breaks as needed during flight.

73.     Pilots at Frontier routinely take physiological needs breaks to use the restroom or stretch or walk in order to address discomfort, cramping or fatigue.

74.     When a pilot takes a physiological needs break, pursuant to Frontier policy, the crew follows safety precautions that include having (1) the pilot who remains in the flight deck wear an oxygen mask in case of sudden loss of pressure and (2) a flight attendant enter the flight deck.

75.     Frontier places no restriction on the duration or frequency of pilots' use of physiological needs breaks for purposes such as stretching, walking, or using the restroom.

76.     Physiological needs breaks for using the restroom or other purposes can take anywhere from 5 to 10 minutes and may take even longer on occasion.

77.     Frontier has maintained a policy, pattern, or practice of prohibiting pilots who are breastfeeding from taking physiological needs breaks for purposes of pumping breast milk. Upon information and belief, the need to express breast milk is the only physiological need that Frontier has prohibited the use of breaks to attend to.

C.      **INDIVIDUAL PLAINTIFFS' ALLEGATIONS**

**Randi Freyer**

78.     Ms. Freyer is and has at all relevant times been employed as a commercial airline pilot by Frontier Airlines. She was hired by Frontier in 2007 as an employee in the Chief Pilot's office and the safety department and began working as a pilot in September 2013.

79.     Ms. Freyer became pregnant with her first child in 2013. Pursuant to Frontier's ban on flying following 32 weeks of pregnancy, she was grounded and forced to take unpaid leave during the 32nd week of her pregnancy.

80.     Ms. Freyer had an uncomplicated, healthy pregnancy and would have been fit to fly for some period of time beyond the 32nd week of pregnancy. She also would have been able to work during the period of time when she was grounded following her 32nd week of pregnancy, had she had the option of being temporarily reassigned to a ground position.

81.     During her pregnancy, Ms. Freyer emailed several individuals at Frontier, including the Chief Pilot and the Director of Training, to offer to work in a ground position after the 32nd week of her pregnancy. No representative from Frontier ever responded to her emails.

82.     Ms. Freyer gave birth to her first child in April 2014. Because of childbirth-related complications, she was on medical leave from August 2014 until December 2014. She received no salary for that time period.

83.     Ms. Freyer returned to work in January 2015. She was still breastfeeding at that time.

84.     In preparation for her return, Ms. Freyer reached out to Frontier's Chief Pilot, Joseph P. ("J.P.") Thibodeau, and the Chief Pilots Office several times to inquire as to how Frontier might accommodate her need to pump breast milk. The Chief Pilot did not respond to her numerous telephone calls or emails.

85.     In addition to contacting the Chief Pilot, Ms. Freyer also reached out to Frontier's Human Resources ("HR") Department with numerous emails and phone calls to inquire about accommodations for pumping and the possibility of working a reduced schedule when she returned to work. No one responded to her inquiries.

86.     Because neither the Chief Pilot nor Frontier's HR Department returned her emails or calls, she was never afforded an opportunity to formally request a specific accommodation in connection with her return to work following the birth of her first child. She was left with no option but to return to work with no accommodations whatsoever.

87.     Ms. Freyer found it was extremely difficult to express breast milk after she returned to work. She tried to express breast milk approximately every three hours, either between flights in the restrooms at outstations, at her hotel on overnight trips, or, when it became necessary due to pain and discomfort, through taking physiological needs breaks during flight in the aircraft lavatory.

88.     Ms. Freyer found that pumping breast milk in the aircraft lavatory was unsanitary, hot, and cramped, but felt she had no other option.

89.     Due to inadequate accommodations for pumping, there was rarely sufficient time to pump. She frequently had to delay pumping due to her flight schedule or flight delays, causing her pain and discomfort.

90.     Ms. Freyer suffered from mastitis twice after she returned to work. The first instance of mastitis occurred in her first required training session upon returning to work, in mid-January 2015. It resulted in an extremely high fever and required her to take antibiotics for ten days.

91.     The second instance of mastitis occurred on one of her first trips soon after her return to flying, on or around March 2015, and lasted approximately three days.

92.     Both instances of mastitis were extremely painful. Both times, after suffering from mastitis, she experienced a reduction in her milk supply.

93.     Ms. Freyer became pregnant with her second child in early 2015 and remained at work until her 32nd week of pregnancy.

94.     Ms. Freyer had an uncomplicated, healthy pregnancy and would have been fit to fly for some period of time beyond the 32nd week of pregnancy. She also would have been able to work during the period of time when she was grounded following her 32nd week of pregnancy, had she had the option of being temporarily reassigned to a ground position.

95.     Because no one had responded to her inquiries regarding a temporary ground assignment during her first pregnancy, she believed that it would be futile to request that accommodation again, and accordingly did not do so.

96.     She gave birth to her second child on December 5, 2015. She was on unpaid leave for 120 days following the birth.

97.     Ms. Freyer was ordered to report ready to work as of April 3, 2016. She was still breastfeeding at the time. From her experience following her first pregnancy, she knew how difficult it would be to attempt to continue breastfeeding after returning to work.

98.     On March 31, 2016, in preparation for her return, Ms. Freyer once again contacted Frontier's Chief Pilot Thibodeau, as well as the Frontier Leave of Absence ("LOA") department and various other Frontier officials, to advise them of her need to take regular breaks because she was breastfeeding, and to ask what policies would be in place to assist her. Because of her experience following the birth of her first child, she believed that no accommodations would be available. She therefore also asked whether she would be eligible to seek a medical leave of absence until her daughter turned one, on December 5, 2016.

99.     A representative from Frontier's HR department, Michelle Zeier, advised her to apply for unpaid leave under the Family Medical Leave Act ("FMLA"). However, Ms. Freyer had exhausted her FMLA leave because of being forced off of work at the end of her pregnancy. Mr. Thibodeau also responded that pilots who were not eligible for FMLA could seek a leave of absence, and advised that she contact Gerardo ("Jerry") Arellano, Senior Employee Relations Manager/Special Projects, for lactation accommodations. She accordingly requested information on breaks for pumping in an email to Mr. Arellano sent on April 19, 2016.

100.    On April 21, 2016 she received an email from LOA attaching forms for non-FMLA medical leave, including a form for her doctor to fill out and a form entitled "Notice to Employee Regarding Non-FMLA Medical Leave." That form stated: "Nursing Mothers: If you are an expecting mother applying for a leave of absence and have a need to express breast milk at

work after returning please contact the leave department. We will work with you to make necessary arrangements."

101.    Ms. Freyer returned the signed form on April 25, 2016, and in an email attaching the forms, she wrote: "I am a nursing mother, and will need to express breast milk at work after returning. I copied the leave department in my previous email to J.P. [Thibodeau]. Your form says that the leave department "will work with you to make necessary arrangements"—Can someone please tell me what types of arrangements would be possible?"

102.    As of the date of the filing of Ms. Freyer's initial EEOC charge, no Frontier representative had responded to her inquiry.

103.    Frontier subsequently responded to her request by placing her on unpaid medical leave. It never responded to her requests regarding other potential accommodations that might be available.

104.    Ms. Freyer is aware of Frontier providing workplace accommodations, including offering alternative ground assignments, to other pilots for reasons unrelated to pregnancy and breastfeeding. For example, one pilot was provided with a desk job position at headquarters when she was unable to fly.

105.    In anticipation of her return to work after her unpaid medical leave, on November 27, 2016, Ms. Freyer reached out once again to the LOA Department to notify Frontier about her return to work. She further informed Frontier that she was still currently breastfeeding and planned to continue to do so for the next several months, and would need regular breaks in order to express breast milk.

106.    She received a response from Cindi Ruff, Vice President of HR at Frontier, on December 8, 2016. Ms. Ruff informed her that Frontier "cannot accommodate pumping in the

lav[atory] while in flight given the safety sensitive nature of your position," and that she would only be "permitted to pump in the lav[atory] before takeoff and after landing, when the plane is blocked into its arrival/departure gate." Ms. Ruff further wrote that "[w]hile the aircraft is in motion / blocked out, physiological breaks are only allowed when they are consistent with Federal Aviation Regulations, FAA Guidance and Frontier's Flight Operations Manuals" and requested that she submit a specific accommodation request once she had bid on and been awarded her monthly flight schedule that included the frequency and duration of breaks that she was requesting.

107.    In response, Ms. Freyer inquired whether she would be permitted to pump in the flight deck for longer flights where pumping would not otherwise be possible for periods as long as four to six hours. She informed Ms. Ruff of her medical history and risk of mastitis and her need to pump every three to four hours.

108.    On December 23, 2016, Ms. Ruff responded by stating that she was not permitted to pump in the flight deck and repeating that she would only be permitted to pump in the lavatory "before takeoff and after landing, when the plane is blocked into its arrival/departure gate after [she had] completed [her] FO duties." Ms. Ruff requested a doctor's certification of Ms. Freyer's need to pump, and stated that once Frontier had received it, the company would "evaluate the request based on your monthly flight schedule and make reasonable efforts to assist you, so long as doing so would not impose an undue hardship on Frontier's business."

109.    Ms. Ruff reiterated in follow-up emails on January 1, January 9, and January 18 related to Ms. Freyer's medical certification that "[a]fter receiving this information from your doctor, we will evaluate the request based on your monthly flight schedule and make reasonable efforts to assist you, so long as doing so would not impose an undue hardship on Frontier's

business," and assured her that Frontier would "work with [her] monthly to determine if Frontier

is able to accommodate [her] restrictions without imposing an undue hardship on the business."

110.     In light of these representations, Ms. Freyer reached out to Ms. Ruff on March 13,

2017 to alert her that she had two trips scheduled for March 19 and April 2, which were both

over four hours long, and to request assistance.

111.     On March 15, 2017, Ms. Ruff told Ms. Freyer that she would be permitted to drop

her minimum required flight time from 70 to 50 hours per monthly bid period, and advised her to

use the automated scheduling system to adjust her own schedule "to accommodate your needs."

112.     On March 17, 2017, Ms. Freyer contacted Ms. Ruff to inform her that changing

her own schedule was not technically possible because the system would not permit her to drop

flights below the minimum required hourly limit. She further explained that unless she heard

from Ms. Ruff regarding other accommodations, she would assume that she would be permitted

to take a physiological needs break during flight to accommodate her lactation needs, and

requested that if that assumption was incorrect, Ms. Ruff let her know as soon as possible.

113.     Ms. Ruff responded via email on March 22, 2017 as follows: "From what you

have described below, it sounds like you are requesting approval to pump in the lav[atory] while

in flight. Unfortunately, we cannot accommodate that request given the safety sensitive nature of

your position. Of course, as I've mentioned to you previously, you are permitted to pump in the

lav[atory] before takeoff and after landing, when the plane is locked (*sic*) into its

arrival/departure gate (but not while in flight)."

114.     Ms. Freyer responded to Ms. Ruff via email on April 8, 2017 making clear that

because her scheduled flights would exceed four to five hours of flying, pumping before or after

a flight was not feasible, and that she would need to take a physiological needs break during

flight for health reasons. She further explained that she had already adjusted her flight schedule

to the best of her ability but was unable to drop any further flights using the automated system

without Frontier's assistance. She noted that she had already been scheduled to fly several long

flights with no relief, which had caused her pain and engorgement, and was contributing to a

decrease in her breast milk supply.

115.    On April 13, 2017, she received a response from Mr. Arellano, repeating that she

was not permitted to pump in the lavatory while in flight.

116.    Despite its promise to do so, no Frontier representative ever responded to her

repeated requests for assistance in adjusting her schedule, even after she had explained that she

was unable to do so herself.

117.    After Ms. Freyer and several of the other Plaintiffs filed their charges of

discrimination, Ms. Freyer learned from news reports that Frontier had claimed that it had

developed a list of facilities at outstations at which pilots who were breastfeeding could express

breast milk. No Frontier representative had provided this list to Ms. Freyer even though Frontier

management was aware of her need to express breast milk on the job and her repeated requests

for related accommodations.

118.    She requested a copy of the list of lactation facilities ("the facilities list") from

Mr. Arellano on April 20, 2016, and again on November 27, 2016 in her email to the LOA

Department. She did not receive a response until December 2, 2016, eight months after her

original request, from Ms. Ruff.

119.    Upon receiving the facilities list, she began visiting the designated locations

during the course of her work. The facilities designated included a combination of lactation

rooms open to the general public and spaces owned or leased by Frontier, including closets,

storage rooms, and shared offices. The facilities list did not provide locations at numerous airports to which she regularly flew, and most of the locations were not reasonably accessible.

120.    For example, on March 10, 2017, Ms. Freyer was in the John Wayne Airport (SNA). It took her approximately ten minutes to reach the designated lactation room, which was outside of security. The process of leaving the secure area and then having to re-clear security left her only ten minutes to pump and clean her equipment before she had to return to the gate. Moreover, the facilities at this location were inadequate—there were no electric outlets in the room, and there was a large window next to the door with no shades or curtains to stop anyone passing by from seeing into the room.

121.    On other occasions, Ms. Freyer found herself unable to gain access to designated facilities at outstations because she was unable to locate them based on the descriptions provided in the list, and Frontier agents were unaware that they had been designated as lactation rooms and/or were unavailable to provide directions or access to the designated facilities.

122.    For example, in Seattle, the description of the location on the list was "Gm/Ramp Supervisor Office Ramp Level Under Gate B1." When she inquired with ramp personnel and a gate agent regarding the designated facility, no one she spoke with was aware of any office fitting that description. In the Northeast Florida Regional Airport (UST), the designated location was "Closet area in holding area." None of the employees she spoke with was aware of the existence of any closet or room fitting that description, or that any room in the vicinity had been designated as a lactation space.

123.    In addition, Ms. Freyer experienced difficulties accessing the lactation room at Denver International Airport, where she is based, and where Frontier's principle hub is located. For example, on March 9, 2017, she attempted to access the room, but when she located the

conference room that had been designated, she found that the door required the entry of a

passcode in order to access the key. No one had informed her of the passcode. Because this

occurred on a weekend, she had to call the "Duty" phone to request access. This required her to

wait for an assistant chief pilot to call back. In total, it took her approximately 15 minutes to

access the room.

124.    The list also did not designate any location at several outstations to which Frontier

regularly flies, including Colorado Springs Airport, John Glenn Columbus International Airport,

Greater Pittsburgh International Airport, and San Antonio Airport.

125.    Ms. Freyer notified Ms. Ruff on March 13, 2017 that the list did not include many

of the airports to which Frontier flew, and that many of the designated locations were

inaccessible. She included a detailed description of the problems she had encountered in

accessing the facilities listed.

126.    Ms. Ruff provided her with an updated list on March 15, 2017.

127.    When Ms. Freyer compared the two lists, she found that the revised facilities list

was still incomplete and that many of the same airports without facilities listed on the original

list still had no location specified. Moreover, most of the facilities that she had identified as

being unusable remained on the list, unchanged.

128.    As a result of these inadequate or nonexistent facilities, Ms. Freyer frequently had

no choice but to pump in restrooms. In some instances, she spent the majority of the time

available to her between flights attempting to reach and access the designated locations,

sometimes without success, leaving her with insufficient time to pump at all between flights. On

those occasions, she suffered from pain and engorgement of the breasts, as well as stress and

anxiety.

129.    She informed Mr. Arellano about the continued inadequacies of these facilities on May 11, 2017.

130.    Ms. Freyer filed an amended Charge of Discrimination with the EEOC on May 15, 2017, which included the allegations described in paragraphs 78-129, above.

131.    As a result of being forced onto unpaid leave at the end of both of her pregnancies, for approximately eight months following the birth of her first child, and for a year following the birth of her second child, Ms. Freyer suffered economic harm, including lost income, increased out-of-pocket costs of health insurance, and loss of benefits.

132.    As a result of Frontier's refusal to accommodate her medical needs related to breastfeeding, Ms. Freyer suffered from emotional distress, stress and anxiety, fear that she would lose her job, and physical pain and suffering.

133.    Ms. Freyer continues to be subject to Frontier's discriminatory policies and practices on an ongoing basis. These policies and practices remain in place and have impacted and continue to impact her plans with respect to her family and her personal reproductive decisions.

**Brandy Beck**

134.    Ms. Beck was hired by Frontier as a commercial pilot holding the position of First Officer on November 17, 2003.

135.    Ms. Beck had been employed by Frontier during her first pregnancy in 2010. Due to serious childbirth-related complications, she was on medical leave from September 2010 until November 2013. She received no salary during this leave but was able to collect benefits under the company's long-term disability insurance plan for two of the three years.

136.     Ms. Beck was cleared to return to work on October 22, 2013 and returned to work in November 2013 following retraining. At the time she returned, she was no longer breastfeeding and was already pregnant with her second child.

137.     Due to medical complications related to her pregnancy, Ms. Beck was grounded and forced to take unpaid leave following the 28th week of her pregnancy.

138.     Although she was willing and able to continue working past that time in a non-flying position, she was not able to do so because Frontier did not offer pregnant pilots any alternatives that would allow pregnant pilots to remain on the job and continue earning a salary during their pregnancy.

139.     Ms. Beck gave birth to her son on June 13, 2014.

140.     Due to childbirth-related complications, Ms. Beck was not medically authorized to return to work until May 2015, when her son was 11 months old.

141.     While Ms. Beck was on leave with her second child, she was contacted by Michelle Zeier. In response to learning that Ms. Beck had a second child and would not be returning to work until May 2015, Ms. Zeier asked her, "Why did you even come back to work?" and stated, "We spent so much money to train you."

142.     Ms. Beck had suffered from both blocked ducts and mastitis, twice, prior to her return to work. She was aware that without the ability to express milk at work, she would experience extreme pain and discomfort, and risk suffering those same medical conditions again, as well as risk reduction of her breast milk supply.

143.     In or around May 2015, Ms. Beck provided Frontier with the required letter from her doctor declaring her "fit for duty." She was still breastfeeding at this time. The letter specified, *inter alia*, that she had a medical need to express breast milk every three hours.

144.    Frontier never responded to the accommodation request contained in her doctor's letter.

145.    Ms. Beck underwent ground training in May or June 2015 and returned to her duties as a pilot in July 2015.

146.    Upon her return to work, she experienced great difficulties in expressing breast milk while at work. She attempted to pump breast milk between flights in the restrooms at outstations, at her hotel on overnight trips or, when it became necessary due to pain and discomfort, by taking physiological needs breaks in the aircraft lavatory during flights.

147.    Ms. Beck found that pumping breast milk in the aircraft lavatory was unsanitary, hot, and cramped, but often felt she had no other option.

148.    On July 29, 2015, having received no response to her initial accommodation request, Ms. Beck emailed Frontier's Supervisor of Disability Program Management, Shelly Leyner, seeking official permission to use the aircraft lavatory as a space for expressing breast milk, and inquired whether there were any lactation rooms in the other outstation airports to which Frontier flies.

149.    More than three weeks later, on August 18, 2015, several weeks after Ms. Beck had already returned to flying, Ms. Leyner responded to Ms. Beck, stating that the lavatory was not a designated room for pumping and informed her that Frontier was working to determine lactation rooms.

150.    Ms. Leyner never provided any further information to Ms. Beck about lactation rooms at Denver International Airport or at outstations, or any other accommodations that might be available to her.

151.    Frontier never offered her or provided her with the lactation facilities list that Frontier had publicly stated was available for pilots who were breastfeeding.

152.    Ms. Beck experienced difficulties accessing the lactation room at Denver International Airport, where she is based, and where Frontier's principle hub is located. The lactation room's distance from the gate made it inaccessible in the time period typically available between flights. When she attempted to use it in August 2015, she was unable to access it because it was being used as a storage facility. When she again attempted to use the room in December 2015, she found that it was still cluttered and scattered with moving boxes and other items. When she attempted to use it in May 2016, she found that the key did not work and she was unable to get in. After she sent an inquiry to Kim Powers, the Supervisor of Flight Operations Administration, Ms. Beck was told that a new facility had been designated, which no one at Frontier had informed her about.

153.    As a result of this inadequate facility and Frontier's denial of Ms. Beck's accommodation request, she was left with no other option but to continue working without adequate accommodations related to her need to express breast milk.

154.    Due to her flight schedule or flight delays, Ms. Beck frequently had insufficient time to pump between flights, whether in the aircraft lavatory or in restrooms at outstations.

155.    Ms. Beck also grew increasingly anxious and concerned that she would be reported to Frontier management for pumping in the lavatory and would be disciplined or suffer other consequences, including losing her job.

156.    Ms. Beck frequently delayed pumping past the point where she had a need to express breast milk, resulting in pain, discomfort, engorgement of the breasts, and a decline in milk supply.

157.     As a result of being forced onto unpaid leave at the end of both of her pregnancies, for eleven and twelve weeks respectively, Ms. Beck suffered economic harm, including lost income, increased out-of-pocket costs of health insurance, and loss of benefits and seniority.

158.     As a result of Frontier's refusal to accommodate her medical needs related to breastfeeding, Ms. Beck suffered from emotional distress, stress and anxiety, fear that she would lose her job, and physical pain and suffering.

159.     Ms. Beck continues to be subject to Frontier's discriminatory policies and practices on an ongoing basis. These policies and practices remain in place and have impacted and continue to impact her plans with respect to her family and her personal reproductive decisions.

160.     Ms. Beck filed an amended Charge of Discrimination with the EEOC on September 1, 2016, detailing the events alleged in paragraphs 133-159.

**Erin Zielinski**

161.     Ms. Zielinski has worked as a commercial pilot and First Officer at Frontier since November 2013.

162.     Ms. Zielinski became pregnant in October 2013. Because of pregnancy-related complications, she lost her medical clearance to fly during the 30th week of her pregnancy and was grounded and forced onto unpaid leave.

163.     Although she would have been willing and able to continue working past that time in a non-flying position, she was not able to do so because Frontier did not offer any alternatives that would allow pregnant pilots to remain on the job and continue earning a salary during their pregnancy.

164.     She gave birth in July 2014 and remained on unpaid leave following childbirth until November 2014.

165.     In anticipation of her return date, Ms. Zielinski emailed Frontier's Senior Employee Relations Manager, Chris Benedict, on November 4, 2014 and alerted him that she was breastfeeding and would need accommodations related to her need to pump breast milk.

166.     On November 6, 2014, Mr. Benedict responded that there was a lactation room at Denver International Airport. Mr. Benedict also stated that "it might be easiest to speak directly just prior to [her] return so that we [could] coordinate access to the room."

167.     Ms. Zielinski knew she might not have enough time to get to the lactation room and back to the plane in time for her scheduled flights, especially if she was flying into or out of a gate located far from the lactation room. This facility in Denver International Airport would also not be useful to her when she was at outstations.

168.     On November 11, 2014, she responded to Mr. Benedict via email inquiring as to where she could pump in airports other than Denver International Airport. Mr. Benedict did not respond to her email.

169.     On November 13, 2014, she wrote to him again, this time to inquire about an additional potential accommodation: whether she could reduce her schedule to 50 flight hours per month from the normal 70. She used her personal Hotmail email account for this correspondence.

170.     Mr. Benedict agreed to a reduced flight schedule but did not respond to her inquiry regarding other available accommodations.

171.     On November 19, 2014, Ms. Zielinski received an email at her personal email address from Michelle Zeier. The email was also addressed to Mr. Benedict, and copied Mr.

Thibodeau, and Jacalyn Peter of the Human Resources Department. Ms. Zeier wrote in the email: "She's still baiting us. No reply. She needs to come in for a meeting. No recordings/no games. Let's chat tomorrow about it."

172.    Upon information and belief, the November 19, 2014 email message was not intended to be addressed to Ms. Zielinski, but rather was an inadvertent "reply all" in response to her November 11, 2014 email query to Mr. Benedict, that was intended to be addressed only to Frontier's management and HR individuals.

173.    Ms. Zielinski was distressed by the implication in Ms. Zeier's email that her inquiry about the location of lactation rooms was viewed by a Frontier Senior Manager as "baiting" and "games." She felt intimidated and was afraid of attending an in-person meeting with a person she knew to be hostile to her request for adequate workplace nursing accommodations.

174.    Almost immediately after receiving Ms. Zeier's email, Ms. Zielinski found that access to her Frontier email account as well as access to Comply 365, an application Frontier uses on company-required iPads to provide access to company manuals and other necessary information pertinent to the pilots' job, had been abruptly suspended.

175.    When Ms. Zielinski contacted Frontier's Information Technology ("IT") department, an IT representative told her that the order to deactivate her account had come from Ms. Zeier.

176.    Ms. Zielinski was extremely concerned about having her Frontier email and Comply 365 account suspended. She was in the midst of studying for recertification exams that were required for her return to work, and without access to the system, she was unable to access

various materials essential for preparing for those exams. Failing the exams could place her job in jeopardy.

177.    As a result, Ms. Zielinski was too intimidated to ask any more questions about workplace nursing accommodation because she believed that doing so would negatively affect her employment.

178.    She decided to drop her request regarding workplace nursing accommodation, accepted the offer of a reduced flight schedule of 50 hours each month, and resolved to attempt to schedule her pumping sessions around her flight schedule.

179.    In an attempt to prevent engorgement, pain, and infection, and in order to maintain her supply of breast milk, she resorted to pumping in the aircraft lavatory before and after each flight whenever possible.

180.    Pumping breast milk in the aircraft's lavatory was unsanitary, hot, and cramped.

181.    Each time she pumped on the aircraft she became anxious and concerned that she would be reported to Frontier management and would be disciplined or suffer other consequences, including losing her job.

182.    She rarely had sufficient time to pump and was frequently anxious regarding the risk of posing delays. She frequently had to delay pumping due to her flight schedule or flight delays, causing pain and discomfort due to engorgement, and she suffered a steep decline in milk supply.

183.    As a result of the decline in her milk supply, she had to supplement her son's diet with formula starting when he was six months old. Ms. Zielinski's breast milk supply dried up entirely when her son was nine months old, despite her desire to continue breastfeeding for a longer period.

184. Ms. Zielinski became pregnant with her second child in or around September-October 2015.

185. Due to medical conditions relating to pregnancy, she went on leave starting on March 9, 2016, when she was approximately 25 weeks pregnant, approximately 3.5 months prior to her due date.

186. Although she was willing and able to continue working past that time in a non-flying position, she was not able to do so because Frontier did not offer any alternatives that would allow pregnant pilots to remain on the job and continue earning a salary during their pregnancy.

187. On April 5, 2016, she was approved for FMLA for the maximum allotted time she had remaining, from March 9, 2016 through June 1, 2016. Frontier also approved unpaid non-FMLA medical leave for the period of June 2, 2016 through August 6, 2016.

188. Ms. Zielinski filed her initial Charge of Discrimination with the EEOC in June 2016.

189. Her second child was born on June 23, 2016. As a result of Frontier's refusal to accommodate breastfeeding and the effect it had had on her ability to continue breastfeeding her first child, she felt that her only option was to seek an extension of her unpaid "maternity leave." She requested and was granted an unpaid non-FMLA medical leave from June 2, 2016 through June 30, 2017.

190. Ms. Zielinski filed an amended Charge of Discrimination with the EEOC on September 1, 2016, detailing the events alleged in paragraphs 160-189.

191. As a result of being forced onto unpaid leave at the end of both of her pregnancies, for four months following the birth of her first child, and for seventeen months

following the birth of her second child, Ms. Zielinski suffered economic harm, including lost income, increased out-of-pocket costs of health insurance, and loss of benefits and seniority.

192.    As a result of Frontier's refusal to accommodate her medical needs related to breastfeeding, Ms. Zielinski suffered from emotional distress, stress and anxiety, fear that she would lose her job, and physical pain and suffering.

193.    Ms. Zielinski continues to be subject to Frontier's discriminatory policies and practices on an ongoing basis. These policies and practices remain in place and have impacted and continue to impact her plans with respect to her family and her personal reproductive decisions.

**Shannon Kiedrowski**

194.    Shannon Kiedrowski began working as a First Officer at Frontier in March 2002. She has been employed by Frontier as a commercial pilot continuously since that time.

195.    Ms. Kiedrowski became pregnant with her first child in March 2010 and worked until the 32nd week of her pregnancy, when she was grounded pursuant to Frontier's ban on flying after 32 weeks of pregnancy and forced to take unpaid leave.

196.    Ms. Kiedrowski had an uncomplicated, healthy pregnancy and would have been fit to fly beyond the 32nd week of pregnancy. Although she was willing and able to continue working past that time in a non-flying position, she was not able to do so because Frontier did not offer any alternatives that would allow pregnant pilots to remain on the job and continue earning a salary during their pregnancy.

197.    Ms. Kiedrowski gave birth to her first child in December 2010. She went back to work in April 2011 when her baby was approximately four months old. At the time she returned to work, she was still breastfeeding.

198.   During the time she was breastfeeding her first child in 2011, Ms. Kiedrowski used a breast pump to express milk on the aircraft. She was unaware of any Frontier policy that would have prohibited her from doing so.

199.   Ms. Kiedrowski became pregnant with her second child in June 2012 and worked until her 30th week of pregnancy, when she lost her clearance to fly due to medical complications and was grounded and forced onto unpaid leave.

200.   Although she was willing and able to continue working past that time in a non-flying position, she was not able to do so because Frontier did not offer any alternatives that would allow pregnant pilots to remain on the job and continue earning a salary during their pregnancy.

201.   Ms. Kiedrowski gave birth to her second child in March 2013. She remained on unpaid "maternity leave" until July 2013.

202.   When she returned to work in July 2013 after giving birth to her second child, she spoke with another female pilot who asked whether she was planning to again use a breast pump to express milk on the aircraft. She confirmed that she did plan to do so.

203.   She subsequently learned that this conversation had been overheard by a male pilot, who was scheduled to fly with her beginning the following month. That male pilot thereafter reported her to the Chief Pilot's Office for using a breast pump on the aircraft.

204.   A few days later, she received a phone call from Michelle Zeier. Ms. Zeier explained that she wanted to schedule a meeting with Ms. Kiedrowski and Mr. Thibodeau to discuss plans for returning to work after her "maternity leave."

205.   The meeting took place a few days later. Zeier, Thibodeau, and a representative from the Frontier Airline Pilots Association ("FAPA"), the union that represented Frontier pilots

at that time, were present. Zeier and Thibodeau said that they had learned that she had been using a breast pump in the aircraft. They questioned her as to why she was breastfeeding, why she was not choosing to feed her child formula, why she thought it was acceptable to use a breast pump in the aircraft, and how long she planned to do so. These questions were asked in an accusatory manner and made her feel anxious and ashamed.

206.    She told Ms. Zeier and Mr. Thibodeau that she knew she had certain rights, under Colorado's WANMA, a copy of which she had brought to the meeting. Their response was that they were aware of the law and they would get back to her as to what they could do to accommodate her.

207.    A few days later, she received a call from Mr. Thibodeau. He told her that she would not be permitted to use a breast pump while on duty. This would have precluded her from pumping even during times when the plane was on the ground in between flights. She explained that she was supposed to fly out for the following three days (Saturday-Monday), and that she would experience major health risks if she simply stopped expressing milk.

208.    Mr. Thibodeau responded by unilaterally removing her from her scheduled flights for these three days and told her he would set up another meeting.

209.    That meeting took place on August 6, 2013. Mr. Thibodeau and Ms. Zeier were present, along with an attorney from FAPA. At this meeting, she was handed a letter stating that effectively immediately, she would "no longer be allowed to pump breast milk while [she] was performing [her] duties as a First Officer." It further stated that removing herself from the flight deck to pump breast milk "compromise[d] safety" and that pumping breast milk in the flight deck was also not an acceptable alternative for similar reasons.

210.     At this meeting, Mr. Thibodeau and Ms. Zeier stated that if she was unable to fly, she would not be paid. Ms. Kiedrowski explained that she wanted to work but that she needed the ability to pump while she was on duty, whether in the airport lavatory or elsewhere.

211.     No resolution was reached. Frontier did not provide her any accommodations related to her need to express breast milk. She understood that Frontier was prohibiting her from taking physiological needs breaks to pump during flight as well as between flights, which she was not prepared to accept.

212.     She later informed Mr. Thibodeau that she planned to pump as soon as she finished her duties on each flight, but that she would do so in the aircraft lavatory. He told her this would be fine as long as there were no flights departing late, but he said he would be monitoring her flights to ensure she did not cause delays.

213.     In order to both pump and fulfill her job requirements, she initially modified her schedule to fly shorter trips or trips with more ground time. As she had relatively high seniority (number 10 of over 300 first officers), she had the ability to bid for short flights. However, other Frontier pilots in the same position would not have had the same opportunities.

214.     Ultimately, a meeting was held in early September 2013 at which Ms. Kiedrowski, Jim Colburn, Director of Operations, and FAPA representatives were present. Ms. Kiedrowski urged Frontier to adopt a policy that would support nursing mothers like herself who were returning to work. Mr. Colburn responded that they did not need to create a policy because her situation was an anomaly and informed her that they intended to handle issues like hers on a case-by-case basis in the future.

215.     The Frontier representatives at the meeting told her that they would look for a room in the Denver International Airport for her to pump and offered to let her pump in the Chief

Pilot's Office until one could be found. She declined this option because she did not feel comfortable with that arrangement, and because she knew that it would not address her need for accommodations outside of Denver. Frontier never notified her whether any other location had been identified. Frontier also told her she could apply for unpaid personal leave on a month-to-month basis, but stated that because it was the holiday season, they could not guarantee it would be granted. For personal and financial reasons, she did not apply for unpaid personal leave.

216.    After this point, it became even more difficult to express breast milk while she was at work. Having been forbidden to pump during flights, she had no option but to pump in the aircraft lavatory between flights, in the restrooms at Denver International Airport and at outstations, or at her hotel on overnight trips.

217.    Each time she pumped between flights, she felt anxious and concerned that she would not be able to complete her duties or be blamed for a flight being late. She felt like she had a target on her back and was worried she would be reported to Frontier management and would be disciplined or suffer other consequences, including losing her job.

218.    She also found pumping breast milk in the aircraft's lavatory unsanitary, hot, and cramped.

219.    She frequently had to delay pumping due to her flight schedule or flight delays, causing pain and discomfort due to engorgement.

220.    Ms. Kiedrowski is aware that pilots have been provided ground positions because they suffered from medical conditions such as vertigo and seizures. However, she was not provided accommodations for reasons related to pregnancy or breastfeeding.

221.    As a result of being forced onto unpaid leave at the end of both of her pregnancies, for four months following the birth of her first child, and for four months following

40

the birth of her second child, Ms. Kiedrowski suffered economic harm, including lost income, increased out-of-pocket costs of health insurance, and loss of benefits and seniority.

222.    As a result of Frontier's refusal to accommodate her medical needs related to breastfeeding, Ms. Kiedrowski suffered from emotional distress, stress and anxiety, fear that she would lose her job, and physical pain and suffering.

223.    Ms. Kiedrowski continues to be subject to Frontier's discriminatory policies and practices on an ongoing basis. These policies and practices remain in place and have impacted and continue to impact her plans with respect to her family and her personal reproductive decisions.

224.    Ms. Kiedrowski filed an amended Charge of Discrimination with the EEOC on September 1, 2016, detailing the events alleged in paragraphs 195-224.

**D.    PLAINTIFFS' NOTICE TO FRONTIER AND MEDIATION OFFERS**

225.    On March 9, 2016, the undersigned counsel sent a letter to Howard Diamond, Senior Vice President, Secretary, and General Counsel of Frontier, to inform Frontier of Plaintiffs' experiences under its discriminatory policies and practices related to pregnancy, parental leave, and breastfeeding, and to demand that Frontier immediately revise those policies and practices. The letter requested the following accommodations be provided:

a.    A policy permitting pilots to seek a temporary modified duty assignment to a ground position during the period when they are ineligible to fly due to pregnancy and during the period when the need to express breast milk precludes them from working for continuous periods without regular breaks;

b.      A policy extending the existing unpaid "maternity leave" to both male and female pilots as parental leave, and extending the period of available unpaid leave from 120 days to twelve months;

c.      A policy providing some period of paid parental leave, to be made available on an equal basis for men and women;

d.      A policy extending eligibility for unpaid medical leave to employees whose need to express breast milk precludes them from working for continuous periods without regular breaks;

e.      A policy ensuring sufficient breaks and a private location other than a restroom for pumping whenever operations permit, including, but not limited to, during training and simulation exercises and at outstations;

f.      Publication of a list of breastfeeding and pumping resources, including the identification of a private, secure location, other than a restroom, at each outstation where breastfeeding employees may pump breast milk (every airport is already required by law to have a room available for its own hourly employees who need to express breast milk);

g.      A policy permitting temporary delegation of pre- and post- flight duties to the other pilot when a pilot is breastfeeding and needs additional break time to express breast milk; and

h.      A policy permitting (but not requiring) pumping in the lavatory on the aircraft on an as-needed basis for the minimum amount of time medically necessary, in light of safety and operational needs (*i.e.*, permitting physiological breaks for pumping).

226.    The March 9, 2016, letter requested a response by March 25, 2016. Frontier failed to respond.

227.    On May 6, 2016, Plaintiffs Freyer, Beck, Kiedrowski, and Zielinski each filed charges with the EEOC, cross-filed with the Colorado Civil Rights Division ("CCRD"), alleging violations of Title VII of the Civil Rights Act of 1964, Colorado's WANMA, the Colorado Law on Reasonable Accommodations for Pregnancy and Related Conditions, and the CADA.

228.    On June 29, 2017, Plaintiffs entered into an agreement with Defendant to toll the statute of limitations for Plaintiffs' WANMA claims as of May 26, 2017 through the date of receipt of a Right to Sue letter from the EEOC.

229.    On December 2, Plaintiffs requested a "Notice of Right to Sue" from the EEOC.

## CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

**Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e-2(a), 2000e(k)
Disparate Treatment Because of Sex (Pregnancy)**

*Post-32-week Pregnancy Ban*

230.    Plaintiffs reallege and incorporate by reference, as if fully set forth herein, each and every allegation of this Complaint.

231.    At all relevant times Frontier has maintained a policy banning pilots who are pregnant from flying commencing at 32 weeks of pregnancy.

232.    Frontier's policy banning pilots who are pregnant from flying commencing at 32 weeks of pregnancy applied regardless of the status of their medical certification of fitness, as determined by the Aviation Medical Examiner.

233.    Pregnancy was the only medical condition mentioned by name or subject to a categorical ban on flying at a particular point regardless of the status of medical certificate of fitness. All other conditions are governed by FAA standards regarding medical certification, and determinations as to medical certification are generally left to the discretion of Aviation Medical

Examiners and are made on an individualized basis based on objective and accepted medical standards in the aviation industry.

234.     Plaintiffs Freyer and Kiedrowski had uncomplicated, healthy pregnancies and would have been fit to fly after 32 weeks of pregnancy. Instead, they were forced onto unpaid leave pursuant to Frontier's policy.

235.     Frontier's policy banning pilots who are pregnant from flying commencing at 32 weeks of pregnancy facially discriminated on the basis of pregnancy in violation of Title VII.

236.     Defendant engaged in unlawful sex discrimination with either malice or reckless indifference to Plaintiffs' federally protected rights.

237.     The blanket ban on flying commencing at 32 weeks of pregnancy has caused Plaintiffs to suffer significant monetary loss, including loss of earnings and other benefits; emotional pain and suffering; physical harm; and other pecuniary and nonpecuniary losses.

## SECOND CAUSE OF ACTION

**Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e**
**Disparate Treatment Because of Sex (Pregnancy)**

*Forced Unpaid Leave &*
*Refusal to Accommodate Pregnancy*

238.     Plaintiffs reallege and incorporate by reference, as if fully set forth herein, each and every allegation of this Complaint.

239.     Frontier has maintained a policy, pattern, or practice of grounding pilots who are more than 32 weeks pregnant or when they develop a pregnancy-related restriction that renders them unfit to fly during their pregnancies and forcing them onto unpaid leave.

240.     Frontier has maintained a policy, pattern, or practice of refusing to engage in an interactive process with or to provide reasonable accommodations to pregnant pilots that would enable them to continue working during the period when they are grounded.

241.     At all relevant times, Frontier has maintained a policy governing provision of accommodations to pilots with disabilities, and policies providing for pilots who had been injured on the job or grounded for reasons unrelated to pregnancy to be placed in non-flying positions.

242.     Frontier engages in an interactive process with and has provided reasonable accommodations to pilots with disabilities, injuries, and medical conditions unrelated to pregnancy, childbirth, or lactation, but who are otherwise similar in their ability or inability to work, including modified duty, temporary alternative job assignments in non-flying positions, and other forms of reasonable accommodation that have enabled them to continue working.

243.     Plaintiff Freyer sought accommodations during her pregnancy, including the option of working in a temporary ground position.

244.     Frontier refused to engage in any interactive process to identify reasonable effective accommodations for Ms. Freyer during her pregnancy. Frontier ignored and therefore effectively denied her accommodation request.

245.     All Plaintiffs have been subjected to Frontier's policy, pattern, or practice of grounding pilots at a certain point during their pregnancies and forcing them onto unpaid leave and refusing to engage in an interactive process with or to provide reasonable accommodations to pregnant pilots during the period when they are grounded.

246.     Defendant's policy, pattern, or practice of grounding pregnant pilots and forcing them onto unpaid leave and refusing to engage in an interactive process with or to provide

reasonable accommodations to pregnant pilots during the period when they are grounded, while

doing so for other workers whose injuries or conditions are unrelated to pregnancy but who are

similar in their ability or inability to work, constitutes disparate treatment because of sex, and

because of pregnancy and related medical conditions, in violation of Title VII of the Civil Rights

Act of 1964, as amended by the Pregnancy Discrimination Act.

247.   Defendant engaged in this unlawful sex discrimination with either malice or

reckless indifference to Plaintiffs' federally protected rights.

248.   Defendant has retained its discriminatory policies and practices despite

knowledge of their harmful and discriminatory effects.

249.   As a result of Defendant's discriminatory policy, pattern, or practice, Plaintiffs

have suffered significant monetary loss, including loss of earnings and other benefits; emotional

pain and suffering; physical harm; and other pecuniary and nonpecuniary losses.

### THIRD CAUSE OF ACTION

**Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e**
**Disparate Impact Because of Sex (Pregnancy)**

*Forced Unpaid Leave &*
*Refusal to Accommodate Pregnancy*

250.   Plaintiffs reallege and incorporate by reference, as if fully set forth herein, each

and every allegation of this Complaint.

251.   Frontier has maintained a policy, pattern, or practice of grounding pilots who are

more than 32 weeks pregnant or when they develop a pregnancy-related restriction that renders

them unfit to fly, and of forcing them onto unpaid leave.

252.   Frontier has maintained a policy, pattern, or practice of refusing to provide

reasonable accommodations to pregnant pilots that would enable them to continue working

instead of being forced onto unpaid leave during the period when they are grounded. Instead Frontier has ignored or categorically denied all accommodation requests related to pregnancy.

253.    All Plaintiffs have been subject to this policy, pattern, or practice.

254.    Defendant's policy, pattern, or practice of grounding pregnant pilots and forcing them onto unpaid leave and refusing to accommodate pregnant pilots during the period when they are grounded has a disparate impact on pilots who are pregnant in violation of Title VII of the Civil Rights Act of 1964, as amended by the Pregnancy Discrimination Act.

255.    As a result of Frontier's policy, pattern or practice of grounding pregnant pilots and forcing them onto unpaid leave and refusing to provide accommodations to pregnant pilots when they are grounded, all pilots who become pregnant and carry their pregnancies to the point where they are grounded will be forced onto unpaid leave with no alternatives.

256.    Upon information and belief, no non-pregnant pilots have been forced to go on unpaid leave pursuant to Defendant's policy, pattern, or practice of grounding pregnant pilots and forcing them onto unpaid leave, or have been subject to a blanket refusal to provide accommodations that would enable them to continue working.

257.    Plaintiffs have presented Frontier with numerous alternative employment practices that would not have the same discriminatory effects, including offering temporary job reassignment or paid leave during the period when they are grounded.

### FOURTH CAUSE OF ACTION

**Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e
Disparate Treatment Because of Sex (Pregnancy and Lactation)**

*Refusal to Accommodate Breastfeeding/Lactation;
Ban on Use of Breaks for Pumping*

258.    Plaintiffs reallege and incorporate by reference, as if fully set forth herein, each and every allegation of this Complaint.

259.    Frontier has maintained a policy, pattern, or practice of refusing to engage in an interactive process with or to provide reasonable accommodations to pilots who are breastfeeding that would enable them to continue breastfeeding and still return to work without risking their health.

260.    At all relevant times, Frontier has maintained a policy governing provision of accommodations to pilots with disabilities, and policies providing for pilots who had been injured on the job or grounded for reasons unrelated to pregnancy to be placed in non-flying positions.

261.    Frontier engages in an interactive process with and has provided reasonable accommodations to pilots with disabilities, injuries, and medical conditions unrelated to pregnancy, childbirth, or lactation, but who are otherwise similar in their ability or inability to work, including modified duty, temporary alternative job assignments in non-flying positions, and other forms of reasonable accommodation that have enabled them to continue working.

262.    All plaintiffs sought accommodations related to lactation during the time period when their schedules would have conflicted with their medical need to express breast milk.

263.    Frontier refused to engage in any interactive process with Plaintiffs and either completely ignored or denied their requests for reasonable accommodations related to breastfeeding.

264.    Defendant has maintained a policy, pattern, or practice of prohibiting pilots who request accommodations related to breastfeeding from using physiological needs breaks to express breast milk during flight.

265.    Defendant has maintained a policy, pattern, or practice of permitting pilots to take physiological needs breaks for purposes of addressing all other physiological needs.

266.    Upon information and belief, pumping, or expression of breast milk, is the only physiological need that pilots are categorically prohibited from using physiological needs breaks to attend to.

267.    Defendant's refusal to engage in an interactive process with or to provide reasonable accommodations to Plaintiffs during the period when they are breastfeeding, while doing so for other workers whose injuries or conditions are unrelated to pregnancy but who are similar in their ability or inability to work, constitutes disparate treatment because of sex, and because of pregnancy and related medical conditions, in violation of Title VII of the Civil Rights Act of 1964, as amended by the Pregnancy Discrimination Act.

268.    Defendant's policy, pattern, or practice of prohibiting pilots who request accommodations related to breastfeeding from using physiological needs breaks to express breast milk during flight, while allowing pilots to take physiological needs breaks for reasons unrelated to pregnancy or lactation, constitutes disparate treatment on the basis of sex (pregnancy and lactation) in violation of Title VII.

269.     Defendant engaged in this unlawful sex discrimination with either malice or reckless indifference to Plaintiffs' federally protected rights.

270.     Defendant has retained its discriminatory policies and practices despite knowledge of their harmful and discriminatory effects.

271.     Defendant's discriminatory policies and practices have caused Plaintiffs to suffer significant monetary loss, including loss of earnings and other benefits; emotional pain and suffering; physical harm; and other pecuniary and nonpecuniary losses.

## FIFTH CAUSE OF ACTION

### Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e
### Disparate Impact Because of Sex (Pregnancy and Lactation)

*Refusal to Accommodate Breastfeeding/Lactation;*
*Ban on Use of Breaks for Pumping*

272.     Plaintiffs reallege and incorporate by reference, as if fully set forth herein, each and every allegation of this Complaint.

273.     Frontier has maintained a policy, pattern, or practice of refusing to provide reasonable accommodations to pilots who are breastfeeding that would enable them to continue breastfeeding and still return to work without risking their health. Instead Frontier has ignored or categorically denied all accommodation requests related to breastfeeding.

274.     Defendant has maintained a policy, pattern, or practice of prohibiting pilots who request accommodations related to breastfeeding from using physiological needs breaks to express breast milk during flight.

275.     Defendant's policy, pattern, or practice of refusing to accommodate pilots who are breastfeeding has a disparate impact on breastfeeding pilots in violation of Title VII of the Civil Rights Act of 1964, as amended by the Pregnancy Discrimination Act.

276.     As a result of Defendant's policy, pattern, or practice of refusing to accommodate pilots who are breastfeeding, virtually all pilots who are breastfeeding when they return to work have suffered detrimental effects due to the absence of necessary accommodations, including being forced to go on unpaid leave, to give up breastfeeding, or, should they attempt to continue breastfeeding once they return to work, experiencing physical pain, emotional distress, and possible health risks.

277.     Upon information and belief, Defendant's policy, pattern, or practice of refusing to accommodate pilots who are breastfeeding has not resulted in any non-breastfeeding pilot being forced to go on unpaid leave or to suffer from pain, discomfort, or any of the other detrimental effects of being unable to address their physiological need to express breast milk.

278.     Defendant's policy, pattern, or practice of prohibiting pilots who request accommodations related to breastfeeding from using physiological needs breaks to express breast milk during flight, while allowing pilots to take physiological needs breaks for reasons unrelated to pregnancy or lactation, has a disparate impact on pilots who are breastfeeding, in violation of Title VII.

279.     As a result of Defendant's policy, pattern, or practice of prohibiting pilots who request accommodations related to breastfeeding from using physiological needs breaks to express breast milk during flight, virtually all pilots who are breastfeeding when they return to work have suffered detrimental effects due to the absence of necessary accommodations, including being forced to go on unpaid leave, being forced to give up breastfeeding, or, should they attempt to continue breastfeeding once they return to work, experiencing physical pain, emotional distress, and possible health risks.

280.    Upon information and belief, Defendant's policy, pattern, or practice of prohibiting the use of physiological needs breaks for pumping has not resulted in any non-breastfeeding pilot being forced to go on unpaid leave or to suffer from pain, discomfort, or any of the other detrimental effects of being unable to address their physiological need to express breast milk.

281.    Plaintiffs have presented Frontier with numerous less discriminatory alternative employment practices that would not have the same discriminatory effects, including granting them permission to pump during flight, providing assistance with scheduling adjustments to avoid longer flights or identify flights with longer turn times, offering leave with pay, and offering pilots who are breastfeeding the option of being placed in a temporary ground position during the time when their physiological needs related to breastfeeding/lactation conflict with their regular flight schedule.

## SIXTH CAUSE OF ACTION

### WANMA, C.R.S. § 8-13.5-101, et seq.

#### *Failure to Provide Lactation Breaks and Location*

282.    Plaintiffs reallege and incorporate by reference, as if fully set forth herein, each and every allegation of this Complaint.

283.    The Colorado general assembly made clear through promulgation of WANMA, "the medical importance of breastfeeding, within the scope of complete pediatric care," and aimed "to encourage removal of boundaries placed on nursing mothers in the workplace." *See* C.R.S. § 8-13.5-102(2).

284.    At all times relevant to this Complaint, Defendant Frontier was Plaintiffs' "employer" for purposes of WANMA.

285.     Defendant failed to make reasonable efforts to provide a private room or location other than a toilet, close to Plaintiffs' work areas, for employees to express breast milk.

286.     Defendant failed to make reasonable efforts to provide reasonable unpaid break time or to permit Plaintiffs to use paid break time, meal time, or both, each day to allow the employee to express breast milk for her nursing child for up to two years after the child's birth.

287.     Defendant engaged in this unlawful sex discrimination with either malice or reckless indifference to Plaintiffs' legally protected rights. Defendant has been on notice since at least 2013 that it was in violation of this provision, and of its harmful effects on breastfeeding pilots.

288.     Defendant has retained its discriminatory policies and practices despite knowledge of their harmful and discriminatory effects.

289.     As a result of Defendant's discriminatory policy, pattern, or practice, Plaintiffs have suffered significant monetary loss, including loss of earnings and other benefits; emotional pain and suffering; physical harm; and other pecuniary and nonpecuniary losses.

## SEVENTH CAUSE OF ACTION

**Colo. Rev. Stat. Ann. § 24-34-402**
**Disparate Treatment Because of Sex (Pregnancy)**

*Post-32-Week Pregnancy Ban*

290.     Plaintiffs reallege and incorporate by reference, as if fully set forth herein, each and every allegation of this Complaint.

291.     At all relevant times Frontier has maintained a policy banning pilots who are pregnant from flying commencing at 32 weeks of pregnancy.

292.    Frontier's policy banning pilots who are pregnant from flying commencing at 32 weeks of pregnancy applied regardless of the status of their medical certification of fitness, as determined by the Aviation Medical Examiner.

293.    Pregnancy was the only medical condition mentioned by name or subject to a categorical ban on flying at a particular point regardless of the status of the individual's medical certificate of fitness. All other conditions are governed by FAA standards regarding medical certification, and determinations as to medical certification are left to the discretion of Aviation Medical Examiners and are made on an individualized basis based on objective and accepted medical standards in the aviation industry.

294.    Plaintiffs Freyer and Kiedrowski had uncomplicated, healthy pregnancies and would have been fit to fly after 32 weeks of pregnancy. Instead, they were forced onto unpaid leave pursuant to Frontier's policy.

295.    Frontier's policy banning pilots who are pregnant from flying commencing at 32 weeks of pregnancy facially discriminated on the basis of pregnancy in violation of CADA.

296.    Defendant engaged in this unlawful sex discrimination with either malice or reckless indifference to Plaintiffs' legally protected rights.

297.    Defendant has retained its discriminatory policies and practices despite knowledge of their harmful and discriminatory effects.

298.    As a result of Defendant's discriminatory policy, pattern, or practice, Plaintiffs have suffered significant monetary loss, including loss of earnings and other benefits; emotional pain and suffering; physical harm; and other pecuniary and nonpecuniary losses.

### EIGHTH CAUSE OF ACTION

**Colo. Rev. Stat. Ann. § 24-34-402.3**
**Colorado Law on Reasonable Accommodations for Pregnancy,**
**Childbirth, and Related Conditions**

*Forced Unpaid Leave &*
*Refusal to Accommodate Pregnancy*

299.    Plaintiffs reallege and incorporate by reference, as if fully set forth herein, each and every allegation of this Complaint.

300.    The State of Colorado amended CADA in 2016 to expressly provide for affirmative obligations on employers to provide accommodations related to pregnancy and breastfeeding. The new law went into effect on August 10, 2016.

301.    Colorado's law specifically requires employers to provide reasonable accommodations to employees with health conditions related to pregnancy or recovery from childbirth, absent undue hardship.

302.    Colorado's law requires employers to engage in an interactive process to identify reasonable accommodations.

303.    Colorado's law specifies that reasonable accommodations may include "the provision of more frequent or longer break periods; more frequent restroom, food, and water breaks; acquisition or modification of equipment or seating; limitations on lifting; temporary transfer to a less strenuous or hazardous position if available, with return to the current position after pregnancy; job restructuring; light duty, if available; assistance with manual labor; or modified work schedules," unless the employer would be required to hire a new employee, fire any existing ones, or create a new position in order to provide the accommodation.

304.    The statute provides a rebuttable presumption that a particular accommodation does not impose an undue hardship if the employer has provided a similar accommodation to other classes of employees in the past.

305.    The statute specifies the employers may not "require an employee to take leave if the employer can provide another reasonable accommodation for the employee's pregnancy, physical recovery from childbirth, or related condition."

306.    Following the effective date of that statute, Defendant has continued to maintain a policy, pattern, or practice of forcing pregnant pilots onto unpaid leave during the period when they are grounded and refusing to engage in an interactive process with or to provide reasonable accommodations to pregnant pilots that would enable them to continue working during the period when they are grounded. Instead Frontier has ignored or categorically denied all accommodation requests related to pregnancy, and forces pregnant pilots to remain on unpaid leave during the period when they are grounded regardless of their ability to work.

307.    Two Plaintiffs, Ms. Freyer and Ms. Zielinski, have been pregnant and have been forced onto unpaid leave, denied the opportunity to engage in an interactive process to identify reasonable accommodations for pregnancy, and denied accommodations related to pregnancy in the period following the law's effective date.

308.    Defendant engaged in this unlawful sex discrimination with either malice or reckless indifference to Plaintiffs' legally protected rights.

309.    Defendant has retained its discriminatory policies and practices despite knowledge of their harmful and discriminatory effects.

310.    As a result of Defendant's unlawful and discriminatory acts, Plaintiffs have suffered significant monetary loss, including loss of earnings and other benefits; emotional pain and suffering; physical harm; and other pecuniary and nonpecuniary losses.

## NINTH CAUSE OF ACTION

### Colo. Rev. Stat. Ann. § 24-34-402
### Disparate Treatment Because of Sex (Pregnancy)

*Forced Unpaid Leave &*
*Refusal to Accommodate Pregnancy*

311.    Plaintiffs reallege and incorporate by reference, as if fully set forth herein, each and every allegation of this Complaint.

312.    Frontier has maintained a policy, pattern, or practice of grounding pilots who are more than 32 weeks pregnant or when they develop a pregnancy-related restriction that renders them unfit to fly during their pregnancies and forcing them onto unpaid leave.

313.    Frontier has maintained a policy, pattern, or practice of refusing to engage in an interactive process with or to provide reasonable accommodations to pregnant pilots that would enable them to continue working during the period when they are grounded.

314.    At all relevant times, Frontier has maintained a policy governing provision of accommodations to pilots with disabilities, and policies providing for pilots who had been injured on the job or grounded for reasons unrelated to pregnancy to be placed in non-flying positions.

315.    Frontier engages in an interactive process with and has provided reasonable accommodations to pilots with disabilities, injuries, and medical conditions unrelated to pregnancy, childbirth, or lactation, but who are otherwise similar in their ability or inability to

work, including modified duty, temporary alternative job assignments in non-flying positions, and other forms of reasonable accommodation that have enabled them to continue working.

316.    Plaintiff Freyer sought accommodations during her pregnancy, including the option of working in a temporary ground position.

317.    Frontier refused to engage in any interactive process to identify reasonable effective accommodations for Ms. Freyer during her pregnancy. Frontier ignored and therefore effectively denied her accommodation request.

318.    All Plaintiffs have been subjected to Frontier's policy, pattern, or practice of grounding pilots at a certain point during their pregnancies and forcing them onto unpaid leave and refusing to engage in an interactive process with or to provide reasonable accommodations to pregnant pilots during the period when they are grounded.

319.    Defendant's policy, pattern, or practice of grounding pregnant pilots and forcing them onto unpaid leave and refusing to engage in an interactive process with or to provide reasonable accommodations to pregnant pilots during the period when they are grounded, while doing so for other workers whose injuries or conditions are unrelated to pregnancy but who are similar in their ability or inability to work, constitutes disparate treatment because of sex, and because of pregnancy and related medical conditions, in violation of CADA.

320.    Defendant engaged in this unlawful sex discrimination with either malice or reckless indifference to Plaintiffs' legally protected rights.

321.    Defendant has retained its discriminatory policies and practices despite knowledge of their harmful and discriminatory effects.

322.     As a result of Defendant's discriminatory policy, pattern, or practice, Plaintiffs have suffered significant monetary loss, including loss of earnings and other benefits; emotional pain and suffering; physical harm; and other pecuniary and nonpecuniary losses.

## TENTH CAUSE OF ACTION

**Colo. Rev. Stat. Ann. § 24-34-402**
**Disparate Impact Because of Sex (Pregnancy)**

*Forced Unpaid Leave and*
*Refusal to Accommodate Pregnancy*

323.     Plaintiffs reallege and incorporate by reference, as if fully set forth herein, each and every allegation of this Complaint.

324.     Frontier has maintained a policy, pattern, or practice of grounding pilots who are more than 32 weeks pregnant or when they develop a pregnancy-related restriction that renders them unfit to fly, and of forcing them onto unpaid leave.

325.     Frontier has maintained a policy, pattern, or practice of refusing to provide reasonable accommodations to pregnant pilots that would enable them to continue working instead of being forced onto unpaid leave during the period when they are grounded. Instead Frontier has ignored or categorically denied all accommodation requests related to pregnancy.

326.     All Plaintiffs have been subject to this policy, pattern, or practice.

327.     Defendant's policy, pattern, or practice of grounding pregnant pilots and forcing them onto unpaid leave and refusing to accommodate pregnant pilots during the period when they are grounded has a disparate impact on pilots who are pregnant in violation of CADA.

328.     As a result of Frontier's policy, pattern or practice of grounding pregnant pilots and forcing them onto unpaid leave and refusing to provide accommodations to pregnant pilots

when they are grounded, all pilots who become pregnant and carry their pregnancies to the point where they are grounded will be forced onto unpaid leave with no alternatives.

329.     Upon information and belief, no non-pregnant pilots have been forced to go on unpaid leave pursuant to Defendant's policy, pattern, or practice of grounding pregnant pilots and forcing them onto unpaid leave, or have been subject to a blanket refusal to provide accommodations that would enable them to continue working.

330.     Plaintiffs have presented Frontier with numerous alternative employment practices that would not have the same discriminatory effects, including offering temporary job reassignment or paid leave during the period when they are grounded.

## ELEVENTH CAUSE OF ACTION

**Colo. Rev. Stat. Ann. § 24-34-402.3
Colorado Law on Reasonable Accommodations for Pregnancy,
Childbirth, and Related Conditions**

*Refusal to Accommodate Breastfeeding/Lactation*

331.     Plaintiffs reallege and incorporate by reference, as if fully set forth herein, each and every allegation of this Complaint.

332.     The State of Colorado amended CADA in 2016 to expressly provide for affirmative obligations on employers to provide accommodations for conditions related to pregnancy, physical recovery from childbirth, and related conditions. The new law went into effect on August 10, 2016.

333.     Colorado's law specifically requires employers to engage in an interactive process to identify reasonable accommodations and to provide reasonable accommodations to employees who are breastfeeding absent undue hardship.

334.     Colorado's law specifies that reasonable accommodations may include "the provision of more frequent or longer break periods; more frequent restroom, food, and water breaks; acquisition or modification of equipment or seating; limitations on lifting; temporary transfer to a less strenuous or hazardous position if available, with return to the current position after pregnancy; job restructuring; light duty, if available; assistance with manual labor; or modified work schedules," unless the employer would be required to hire a new employee, fire any existing ones, or create a new position in order to provide the accommodation.

335.     The statute specifies the employer may not "require an employee to take leave if the employer can provide another reasonable accommodation for the employee's pregnancy, physical recovery from childbirth, or related condition."

336.     Two of the Plaintiffs, Ms. Freyer and Ms. Zielinski, have been breastfeeding and have been denied accommodations in the period following the law's effective date.

337.     Following the effective date of that statute, Defendant has continued to maintain a policy, pattern, or practice of refusing to provide reasonable accommodations to pilots related to breastfeeding/lactation that would enable them to continue breastfeeding while still returning to work without risking their health. Instead Frontier has ignored or categorically denied all accommodation requests related to breastfeeding / lactation.

338.     Defendant engaged in this unlawful sex discrimination with either malice or reckless indifference to Plaintiffs' legally protected rights.

339.     Defendant has retained its discriminatory policies and practices despite knowledge of their harmful and discriminatory effects.

340.     As a result of Defendant's unlawful and discriminatory policy, pattern, or practice, Plaintiffs have suffered significant monetary loss, including loss of earnings and other

benefits; emotional pain and suffering; physical harm; and other pecuniary and nonpecuniary losses.

## TWELFTH CAUSE OF ACTION

### Colo. Rev. Stat. Ann. § 24-34-402
### Disparate Treatment Because of Sex (Pregnancy and Lactation)

*Refusal to Accommodate Breastfeeding/Lactation;*
*Ban on Use of Breaks for Pumping*

341.    Plaintiffs reallege and incorporate by reference, as if fully set forth herein, each and every allegation of this Complaint.

342.    Frontier has maintained a policy, pattern, or practice of refusing to engage in an interactive process with or to provide reasonable accommodations to pilots who are breastfeeding that would enable them to continue breastfeeding and still return to work without risking their health.

343.    At all relevant times, Frontier has maintained a policy governing provision of accommodations to pilots with disabilities, and policies providing for pilots who had been injured on the job or grounded for reasons unrelated to pregnancy to be placed in non-flying positions.

344.    Frontier engages in an interactive process with and has provided reasonable accommodations to pilots with disabilities, injuries, and medical conditions unrelated to pregnancy, childbirth, or lactation, but who are otherwise similar in their ability or inability to work, including modified duty, temporary alternative job assignments in non-flying positions, and other forms of reasonable accommodation that have enabled them to continue working.

345.    All plaintiffs sought accommodations related to lactation during the time period when their schedules would have conflicted with their medical need to express breast milk.

346. Frontier refused to engage in any interactive process with Plaintiffs and either completely ignored or denied their requests for reasonable accommodations related to breastfeeding.

347. Defendant has maintained a policy, pattern, or practice of prohibiting pilots who request accommodations related to breastfeeding from using physiological needs breaks to express breast milk during flight.

348. Defendant has maintained a policy, pattern, or practice of permitting pilots to take physiological needs breaks for purposes of addressing all other physiological needs.

349. Upon information and belief, pumping, or expression of breast milk, is the only physiological need that pilots are categorically prohibited from using physiological needs breaks to attend to.

350. Defendant's refusal to engage in an interactive process with or to provide reasonable accommodations to Plaintiffs during the period when they are breastfeeding, while doing so for other workers whose injuries or conditions are unrelated to pregnancy but who are similar in their ability or inability to work, constitutes disparate treatment because of sex, and because of pregnancy and related medical conditions, in violation of CAD.

351. Defendant's policy, pattern, or practice of prohibiting pilots who request accommodations related to breastfeeding from using physiological needs breaks to express breast milk during flight, while allowing pilots to take physiological needs breaks for reasons unrelated to pregnancy or lactation, constitutes disparate treatment on the basis of sex (pregnancy and lactation) in violation of CADA.

352. Defendant engaged in this unlawful sex discrimination with either malice or reckless indifference to Plaintiffs' legally protected rights of.

353.     Defendant has retained its discriminatory policies and practices despite knowledge of their harmful and discriminatory effects.

354.     As a result of Defendant's policy, pattern, or practice, Plaintiffs have suffered significant monetary loss, including loss of earnings and other benefits; emotional pain and suffering; physical harm; and other pecuniary and nonpecuniary losses.

## THIRTEENTH CAUSE OF ACTION

**Colo. Rev. Stat. Ann. § 24-34-402**
**Disparate Impact Because of Sex (Pregnancy and Lactation)**

*Refusal to Accommodate Breastfeeding/Lactation*
*Ban on Use of Breaks for Pumping*

355.     Plaintiffs reallege and incorporate by reference, as if fully set forth herein, each and every allegation of this Complaint.

356.     Frontier has maintained a policy, pattern, or practice of refusing to provide reasonable accommodations to pilots who are breastfeeding that would enable them to continue breastfeeding and still return to work without risking their health. Instead Frontier has ignored or categorically denied all accommodation requests related to breastfeeding.

357.     Defendant has maintained a policy, pattern, or practice of prohibiting pilots who request accommodations related to breastfeeding from using physiological needs breaks to express breast milk during flight.

358.     Defendant's policy, pattern, or practice of refusing to accommodate pilots who are breastfeeding has a disparate impact on breastfeeding pilots in violation of CADA.

359.     As a result of Defendant's policy, pattern, or practice, Plaintiffs have suffered significant monetary loss, including loss of earnings and other benefits; emotional pain and suffering; physical harm; and other pecuniary and nonpecuniary losses.

360.     Upon information and belief, Defendant's policy, pattern, or practice of prohibiting the use of physiological needs breaks for pumping has not resulted in any non-breastfeeding pilot being forced to go on unpaid leave or to suffer from pain, discomfort, or any of the other detrimental effects of being unable to address their physiological need to express breast milk.

*361.*     Plaintiffs have presented Frontier with numerous less discriminatory alternative employment practices that would not have the same discriminatory effects, including granting them permission to pump during flight, providing assistance with scheduling adjustments to avoid longer flights or identify flights with longer turn times, offering leave with pay, and offering pilots who are breastfeeding the option of being placed in a temporary ground position during the time when their physiological needs related to breastfeeding/lactation conflict with their regular flight schedule.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendant, and grant them all relief as allowed by law and equity, including, but not limited to, the following:

A.     A Declaration that Defendant's employment policies, practices, and/or procedures challenged herein are illegal and in violation of the rights of Plaintiffs;

B.     A permanent injunction against Defendants and its partners, officers, owners, agents, successors, employees, and/or representatives, and any and all persons acting in concert with them:

      i.     Enjoining the continued operation of the policies and practices challenged herein, including the post-32-week pregnancy ban, the practice of refusing to

accommodate pregnant pilots, the practice of refusing to accommodate pilots who are breastfeeding, and the practice of banning the use of physiological needs breaks for pumping;

   ii.   Ordering Defendant to adopt and implement policies that will provide for reasonable and effective accommodations for pregnant and breastfeeding pilots;

   iii.   Ordering Defendant to provide notification to eligible employees of these policies related to accommodations for pregnant and breastfeeding pilots;

   iv.   Ordering Defendant to implement training to managers and human resources personnel regarding these new pregnancy and breastfeeding accommodations policies;

   v.   Awarding any other appropriate equitable relief to Plaintiffs; and

C. An Order providing that this Court shall retain jurisdiction of this action until such time as the Court is satisfied that Defendants have remedied the practices complained of herein and are determined to be in full compliance with the law; and

D. An award of litigation costs and expenses, including, but not limited to, reasonable attorneys' fees, to the Plaintiffs; and

E. An award of any additional relief, including compensatory and punitive damages, this Court deems just and proper.

## **JURY DEMAND**

Plaintiffs request a jury trial on all matters so triable alleged herein.

Dated this 10th day of December, 2019.


*s/Sara R. Neel*

_____

Sara R. Neel
Mark Silverstein
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF COLORADO
303 East 17thAvenue, Suite 350
Denver, CO 80203
Phone: 720-402-3107
Fax: 303-777-1773
Email: sneel@aclu-co.org
Email: msilverstein@aclu-co.org

Galen Sherwin
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
WOMEN'S RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, New York 10004
Phone: 212-519-7819
Email: gsherwin@aclu.org

Vincent Levy
Jayme Jonat
Lani Perlman
HOLWELL SHUSTER & GOLDBERG LLP
IN COOPERATION WITH THE AMERICAN CIVIL LIBERTIES UNION
425 Lexington Avenue, 14th Floor
New York, NY 10019
Phone: 646-837-5151
Fax: 646-837-5150
Email: vlevy@hsgllp.com
Email: jjonat@hsgllp.com
Email: lperlman@hsgllp.com

*Attorneys for Plaintiffs*